Thank you, your honor. May it please the court. My name is Jim Otteson, counsel for Crocs. We would submit that the ITC committed legal error in finding a prima facie case of obviousness of the 858 patent. Let me explain why that is, based on the evidence. This is the Crocs shoe, an example of which was marked as CPX39 at trial. The commission found that this shoe practiced the 858 patent, and it includes what the ITC acknowledged to be the 858 patent's passive restraint system, which I'll get into. For thousands of years, shoes with straps have been designed and constructed on the principle... Are you dealing with the utility patent now, or the design patent? The utility patent, your honor. The 858. You're talking about validity. That is correct, your honor. I'm talking about obviousness. The process prior art consists of a shoe without a strap, plus the Aguirre patent that shows a strap, right? That is the contention, that was the best... That was the holding, right? That was the holding of the ITC, that's correct. Why is that incorrect? It's incorrect, and I'm glad you mentioned Aguirre. I was going to get to that. The main point of Aguirre, and this goes to what I was just about to say, which is that for thousands of years, shoes have been constructed with straps, where the principle of the construction was to have a strap that fits snugly behind the heel of the foot. That's the same principle used in Aguirre. Repeatedly, over and over in Aguirre, the Aguirre patent says that it used an elastic strap to make sure that the strap fits snugly behind the heel. This shoe, the Croc shoe, which the commission found to practice the 858 utility patent, is radically different from that. It has a passive restraint system, which results from this direct foam-to-foam contact between the strap and the base of the clog, so that you can see the strap will maintain... Yes, you're on. It's a little difficult to me, because it seems like the bulk of your argument on the 858 is that you have this revolutionary, I think you call it revolutionary repeatedly in your brief, this passive resistance, is it passive restraint or passive... Passive restraint, your honor. Where is the reference to passive restraint in the spec or the claim? Right here. In the specification of the 858 patent, at column six, lines 17 through 31. Okay. It talks about a strap that can be placed in an intermediary position, says in some embodiments... How about in the claim though, if you're asserting the fact that... In the claim too, your honor. Please show us in the claim. Here's the claim. This is at column nine, lines 46 through 53, wherein frictional forces developed by the contact between the strap section and the base section at the plastic connectors are sufficient to maintain the strap section in place in an intermediate position after pivoting, whereby the strap section lends support to the Achilles portion of the human foot. Now, the ITC found that this language here, lends support, means what... Is that what is your view of when you talk about repeatedly the revolutionary idea of the same as lending support? Yes. Because if you look at what the specification says about lend support, your honor, it says... I mean, this... Foam-to-foam friction serves the utilitarian purpose of lending support to the Achilles portion of the foot. In some embodiments, the frictional force between the strap and the upper at the location of the rivets is sufficient to maintain the strap in place. This helps to assure that the strap remains in place even when the Achilles part of the foot is not pressing against the strap. This is what's revolutionary about this, your honors, is that most of the time when somebody is wearing the shoe, and this is described in the 858 patent, the strap is not pushing against the back of their foot. It's completely different than every strap that you've ever seen for thousands of years. Is the revolutionary idea that the foot doesn't touch the back strap at all, or that it touches it only on occasion? It's not that it never touches it. If you see what the specification says, this helps to assure that the strap remains in place even when the Achilles part of the foot is not pressing against the strap. Without such friction, the strap would succumb to gravity and fall to a position where the foot would not be supported. So, unlike elastic straps or straps with buckles, like Mr. Can I interrupt you, Judge? I think this is an important point. Absolutely. If you look at the Aguirre patent, and at least right on the first page, the strap there is staying in position. There's no foot holding the strap in position. The strap maintains the same position even if the foot is not touching it, right? Well, that's what it looks like. But if you read the Aguirre patent, and it says this over and over and over, it says the strap is elastic so that it fits firmly against the heel of the foot. And we cited all those references to Aguirre in our papers. That's why Aguirre is completely different than this firm foam strap in the 858 patent. It's completely different. Now, if you don't mind my pointing a phrase, why don't you walk us through the non-infringement issue? The non-infringement issue on the design patent. On the design patent. Thank you, Your Honor. But just before you leave that, there's no prior art that shows a foam strap anywhere, is there? No, there is no foam strap in the prior art. In fact, I had to blow up for it, but we have a lot of credence to the idea that foam would tear, right? Well, that's what our expert said. Our expert said that foam would tear. That's why nobody would... And he is an expert. And he is an expert. Their expert, who was legitimately an expert in shoes, he's been collecting magazines, shoe advertisements for 40 years. He said that with a strap, you want to have a strap that's elastic or adjustable, or preferably both, he said, so that you get that strap against the back of the foot. And then on top of this all, you have secondary considerations of skepticism of experts, copying, industry praise, before we even get to commercial success. Maybe one of the best commercial success cases ever. Yeah, but that's tough. You never know whether that's marketing or not. But if you combine that with the fact that there was no prima facie case of obviousness, because it wasn't obvious to use a foam strap, and in fact... Let me ask you about the foam. If we concede that the record is clear that everybody thought that foam wasn't necessarily the best kind of strongest kind of material to use, why does that matter? I mean, we've got foam on foam. One would accept, would we not, that in the fashion industry and in the shoe industry, the notion of resiliency is not necessarily always paramount. There are plenty of designs that do very well that are entirely inefficient and impractical. Like stiletto heels. Sure. So why... Absolutely. And so the notion of fashion is that it's an idea to use the same material. That would be pretty obvious, right? That you would use leather with leather, foam with foam. So why should we just displace the whole notion that it would have been obvious simply because it was a less practical material? Okay, that's an excellent point, Your Honor. And the point is, not only was it a less practical material... Most points made from the bench are excellent. Thank you, Your Honor. Not only was it a less practical material because it might tear at the rivets, it also created a system that was revolutionary because it created something that somebody could wear where that is not constantly pressing against the back of their foot. Yeah, but we're talking about two separate things. That's why there's the foam on foam argument and there's the passive restraint system. But foam, EVA foam, is good for the passive restraint system because it maintains this U position. And that's why it's not constantly... It's not elastic. It's not stretchable. And that's why it only hits the back of the foot when it's needed. All right, why don't we move on to the 789 design infringement argument? So with respect to the commission's finding that the accused shoes don't infringe the 789 design patent, I would submit that the commission committed legal error in its application erroneously of the ordinary observer test, and also in applying an erroneous claim construction in a checklist fashion. Is this one of those cases where we, in our Egyptian goddess, really suggested it's better not to have written Markman hearings? Well, that's what the court said. I mean, the court did not say, in fairness, the court did not say that it was error to have a written claim construction. By court, you mean Egyptian goddess? Correct, correct. But we also kind of note that it invites inordinate attention to points of novelty and other things that destroy the ordinary observer totality of the impression test. Yes. And isn't that a little bit what happened here? That's exactly what happened here. In fact, what our expert testified was that... And I've talked about this a lot in the briefing, so I don't need to belabor it. Why didn't the judge wait until Egyptian goddess was done? It was briefed, it was coming. It was, no, well, it was the ITC. I mean, the ITC has their own deadlines. So, I mean, I think Egyptian goddess is extremely informative. But you would have understood if the parties would have certainly given time for there to be, for the federal circuit to speak, right? Well, yeah. I mean, I don't want to get into the specifics of, you know, ITC procedure. I think the ITC felt like they had to render a decision. So should we send it back if they use the whole... If, according to you, they used the erroneous analytical framework, why shouldn't we send it back and let them do it under the right framework? I don't really think that's necessary because I think the result here is very clear. What our expert did and our argument was... When it comes to shoes, is it someone who just takes a quick look or is it someone who's in the business and notices the difference between circles and diamonds? It's absolutely not somebody who's in the business. As the Supreme Court said in Gorham many, many years ago, it's the ordinary observer is a person who might pick up one of these shoes and be interested in buying it. They might walk into a store, see it hanging on the rack and say, oh, that looks interesting. Pick it up, maybe look at it a little bit, try it on, spending a few minutes. Wouldn't an ordinary observer notice, for instance, if there was only one hole as opposed to the multiple number of holes? Would an ordinary observer notice that there's a difference? I think the ordinary observer would notice that there was only one hole. Yes, Your Honor. However, for all of the infused shoes, they all had a plurality of holes across the top and around the side. But some of which were substantially, significantly different shapes, right? Well, some of them were different shapes. I mean, I don't think I'd say substantially different because they were all about the same size. They were all, you know, so that you can kind of see the thickness through the hole and distribute it evenly across the shoe. But what our expert focused on were these two dominant design features. What we called at the hearing, or what the experts called at the hearing, the ring of fire and the eye of Sauron. But if we're looking, if the question here is an ordinary observer, are you suggesting that that's something that the ordinary observer would have been attuned to? Yes. They had the ring of fire. Absolutely. I thought those were kind of subliminal. Not at all, not at all. Let me explain why that is. If you look at the ring of fire, what it really is, it's a synergistic interaction between big dominant design features of both the clog base and the strap. So what you get here is you have in every single one of these acute shoes, every single one, an extremely well-defined sidewall, just like in the patent. And it goes all the way around the front of the shoe. And it's continued through this strap that mirrors the width of it, mirrors the width of the sidewall. But you agree that even if the acute clogs of the acute shoes had that ring of fire and had all of that, if there were only one hole, for instance, as opposed to the multiple holes there, an ordinary observer... I think I'd agree with that. ...could tell the difference. I think I'd agree with that. But my only point is that what we're focusing on is what would have been confusing and created substantial similarity are big dominant design features. Also this eye of Sauron. This is a synergistic interaction, again, between the strap assembly and the underlying clog because the strap assembly is placed here with this prominent round rivet at a point on the shoe where all of these design lines and curves flow into it. It's placed at an intersection. And neither one of these existed in the prior art. They didn't exist until the inventor, Scott Siemens, took a strap of similar width and put it on the prior art clog at that location. So it's undisputed that these big dominant design features did not exist in the prior art. The mission and the ITC here focused on whether the strap was of uniform width throughout. It focused on the length of the strap vis-a-vis the end of the shoe. And it focused on the holes and whether they were round or different shape and so forth. Yes. How are we supposed to assess? Is it a question of law? The determination is whether an ordinary observer would have thought that there was substantial similarity between the accused shoes and patented shoes. How are we supposed to assess that? Well, I think there's enough in the record. In fact, we submitted dozens of pages of evidence. And that's all cited in the record. In fact, we cited the only evidence in the record about how an ordinary observer would analyze substantial similarity. Are we supposed to... Is there some deference here for fact-finding on the question of what an ordinary observer would have thought? Or is it entirely a question of law? Well, I think this is something this court can resolve as a matter of law. The ITC incorrectly applied the ordinary observer test. They focused on, as you said, things like this. How far back did the strap go? I mean, I think you'd agree that somebody walking into a shoe store is going to be hard-pressed to notice that as a difference. Whereas if you look at the synergistic interaction of these major design features that our expert referred to and testified that they weren't in the prior art... You're in a difficult position of arguing the significance of differences for your utility patent, the lack of significant differences for infringement. You've consumed your time, but we've asked you a lot of questions and we'll give you back your rebuttal time. Why don't we hear from the other parties? Thank you, Your Honor. Mr. Jardine and Mr. Dunner are going to split their time. And I'll try to let you know when your eight minutes has passed, but you'll keep an eye on the clock too. Thank you, Your Honor. May it please the court. In this case, the commission determined there was no violation of Section 337 and supported by substantial evidence consistent with the law. I think I'll just dive right into, I guess, rebutting the arguments just made by Croc's counsel. I guess particularly regarding the 70-day design patent, particularly the key features of the design patent. Are clearly shown, illustrated. They sure look alike. And the differences between a circle and a diamond, gee, I think an ordinary observer would think they're pretty much the same. Well, again, the proper infringement test is between the patented design and the accused shoe. It's not the, particularly in this case, the Croc's. But don't we have an error of the ITC in focusing too much in its claim construction on points of novelty, which we ruled out in Egyptian Goddess. We put that emphasis back on the ordinary observer and the totality of the design. And if you read through the ITC opinion, it's talking about the length of the strap and the width of the strap, points of novelty. That isn't the test anymore. Right, exactly. I don't think that's what the commission did in this case. We pretty much followed what Egyptian Goddess teaches us. The Egyptian Goddess teaches us that the sole proper test is the ordinary observer test. And as part of that test- No, they invoke the ordinary observer test. That's true. But then it's discussion is focused on unique little points. It isn't talking about the overall impression. Right, but Egyptian Goddess typically teaches us to focus on the differences for the proper results. It teaches us that the infringement is the overall impression, not an overemphasis on points of novelty. The point of novelty test was extracted from the ordinary observer test. That's kind of the black letter law of Egyptian Goddess, isn't it? Right, but Egyptian Goddess also includes that it would determine whether an ordinary observer would notice these differences. Mr. Jardine, I'm looking at the picture in the patent. Accused CLI Payless Airwalk RPX 101. Am I looking at the right stuff? Am I comparing an accused with what's in the patent? Right, again, if you go to- And they both have the body of the shoe, plus the strap, plus even circular holes. They don't all have circular holes, but they have circular holes on the front and these trapezoidal soles on the side. Why wouldn't an ordinary observer clearly think they're the same? Right, again, I think Egyptian Goddess teaches us that despite any apparent similarities between the designs, ordinary observer would discern these key differences between the patented design. How does Egyptian Goddess tell us that? I mean, you have to look at the particular accused and deal with a particular patent. How would an ordinary- I've looked at those pictures with our presiding judge and tell me how an ordinary observer would say to himself, oh, this is obviously something different. Okay, the fact finder- What would that ordinary observer, if I go to the store to replace the shoes that I wear to the swimming pool every night, I wear my Crocs, why wouldn't I confuse these? Again, you're comparing the patented design illustrations to the accused shoe. And if you go to appendix page 103.95 to 96, you see the key differences here. You see uniform width of the strap extending to the heel and you see uniform spacing of the ventilator holes, including the front sidewall section. And again, these are shoes. An ordinary observer would notice these key differences and notice- I'm going to measure the width of the strap when I'm in the supermarket buying a Croc? Right, but again, although there may be- I'm going to check and see whether these holes are trapezoids or rectangles. You really think that's what ordinary observers do as they focus in on that detail, those points of novelty, which we said in Egyptian Goddess, you're not supposed to focus in on? Again, I don't think it's a focus on point of novelty. It's a focus on the differences as consistently Egyptian Goddess teaches us and cites to Goodyear. And in both of those cases, the site- But the differences have to emerge as glaring from the overall impression. And the overall impression that I'm getting an ordinary observer might get is striking similarity. Again, it would be glaring to an ordinary observer. And then if you look at the shoe, you see that there's non-uniform spacing. This is about two inches difference. And if you went to uniform spacing, that's three quarters of an inch. That would be a difference recognized- I'm going to notice that, ordinary observer. I'm going to pick up on that real quick in the supermarket, right? I'm going to see, aha, there's a hole missing. This must be a different product. Right, as a whole- That's the way my mind is supposed to work under your theory. Right, as a whole, these differences, these three key differences, as a whole, ordinary observer would discern. And again- I'm going to see that hole, measure the width of that strap, and see it doesn't extend to the heel. And I'm going to say, oh, that's different. Again, we're talking about a smaller product,  depending on someone's size of their foot. An ordinary observer would discern these differences. You want to defend the commission's holding on obviousness? Yes, just let me just recognize that, again, the comparison step of performing ordinary observer tests is a substantial evidence standard, so that only that has to satisfy that a reasonable mind would find the evidence shown to be adequate to support the conclusion. Now, regarding the 858 utility patent, again, the commission correctly found that it's simply- it's the obvious addition of a known foam strap to a known foam shoe. Known foam strap? Right, exactly. Is there any foam strap in the prior art? Right, their own witness testified. Ready off, if you go to the attendant's page. Is there any prior art presented that shows a foam strap? I know about the testimony, but there was no- no one produced a foam strap piece of prior art that we can- a printed publication, a patent, a standard form of prior art. Right, there was testimony from their own witness that they experimented with a foam strap that was not flexible at all prior. That probably would have been a trade secret. It probably would have been- well, you'd have to produce it in some form for it to be prior art anyway, wouldn't you? So, to answer my question, you have still not shown me anywhere in the record where there's a piece of prior art that has a foam strap. Well, there's testimony indicating that there was experimentation with foam straps prior to even the existence of the prior aqua clog. And I- and we can both, as patent lawyers, think of about four reasons that's not prior art, can't we? Right, but again, given in view of KSR, we have one of ordinary skill, one with multiple years of experience. You're saying even if it's not expressly in the prior art, straps are. And to make it the same foam that the rest of the shoe is, is no big deal. Right, exactly. In view of KSR, any known problem, need, market demand can be found as a motivation to combine. So, one of ordinary- The prior art strap is a gear. Ah, right, that was- And that clearly is talking about an elastic strap. Right, that is- And there's nothing elastic about the 858F strap. Right. Right. But again, evidentiary record shows that, one, a gear recognized the existence of frictional forces between the body of the strap and the body of the shoe and the strap is even admitted by a croxone expert. Two, that the prior art shows inelastic and unstretchable strap examples. And also, again, one of ordinary skill in the art is a person with multiple years of experience in molded foam products, including footwear. It would be just an obvious addition for market demand, a substitution to make a complete uniform shoe of one material to add the foam strap to a foam shoe in a manner recited by 858 Patton. But there was no strap in the prior art. I mean, they say the revolutionary idea here is this sort of lens support, which is sort of only intermittent, sort of holding onto the back of the foot, but not necessarily at all times during the function of holding it, which seems to be what a gear is about, right? Again, that'd be countered by the evidentiary record. The evidentiary record shows, again, from the agar Patton and the prior art PTO rejection. If you go to A 1778 through 79, that feature was rejected until they changed pivotal foam, pivotal back strap to pivotal foam back strap. It was just the addition of the term foam that made it allowable to the PTO. Mr. Jardine, do you want to yield in favor of Mr. Gunner? You've consumed 10 minutes. Oh, yes, that's fine. Again, I just want to reiterate again that as supported by substantial evidence consistent with the law, commission's ultimate determination, no violation should be affirmed. Mr. Gunner, back on the obviousness point, the examiner had a gear in front of him and allowed this patent.  Yes, sir. Your honor. In other words, all of the items the prior art was before the examiner. We often hear arguments that when the prior art isn't before the examiner, we ought to discount the clear and convincing standard. Well, perhaps when the prior art is before the examiner, we ought to underscore the clear and convincing standard, shouldn't we? Your honor, that is not exactly true. And the reason it isn't exactly true is that Siemens, the inventor, submitted a picture of the aqua clog, which is the key prior art. You cannot even see what the product is in that piece of paper. And I had it in front of me. And for some reason, it has disappeared. But it's mentioned in our brief. Well, here it is. It's on page 17638 of the record. You cannot even see what it is. So from a practical standpoint, the examiner did not have aqua clog before him. And moreover, this whole concept of passive restraint is a litigation. Back and forth sure shows that the examiner was aware of the issues, the similarities, the dissimilarities, early rejections, cured with allusions to the revolutionary design. Why doesn't this underscore the clear and convincing standard? Because the examiner never had before him or her, I don't know which, an aqua clog. Without an aqua clog, a proper examination could not have been made. If you look at that page that I identified, 17638, it's a blur. Does the examiner ever say, I don't have enough here to make a proper examination? I'm not sure we should attack examiners unless they give us some record on which to attack them. Your Honor, the record is clear. The examiner, when the examiner doesn't have something, the examiner doesn't know to ask for something the examiner doesn't have. When the examiner is given a piece of paper with a picture on it that is barely legible, that certainly does not display the aqua clog, a reasonable examiner, in my view, would not have said, hey, is there an aqua clog? No, they would say, give me a full explanation if I need it. That's what examiners do, or they reject if you don't. Show me the exact prior art. Obviously, that wasn't an issue for this examiner. It wasn't an issue. It was the examiner had no idea this was critical prior art. We have to assume the examiner did a reasonable job on the basis of information before the examiner. If there is a presumption to arise from the regularity of what the examiner did, it has to be based on the record. And when you look at this record, there was no aqua clog in the record. And I submit, Your Honor, that you should not give deference, at least from that standpoint, about aqua clog. Did the ITC inordinately discount the secondary considerations here? We've emphasized them post-KSR, talking about them as independent evidence of non-obviousness. In my view, no, Your Honor. The biggest point that was argued was commercial success. And their president, Mr. Snyder, admitted that the commercial success was due to a lot of features, design features and other features. And the ITC says there's no commercial success. If so, how did Kroc make $234 million? The question is, make $234 million on what? The cases say, and there are several cases that say, that the presumption that there's commercial success must assume that the commercial success is due to the difference between the claim that mentioned and the prior art. And Mr. Snyder admitted, well, aqua clog didn't make $234 million, frankly, because it didn't stay on your foot. The Kroc makes that money because it does stay on my foot when I walk to the swimming pool. They also made money on Kroc's with washers. And they've admitted that Kroc's with washers don't infringe. So why were those things commercially successful? The answer is, you have to be able to attribute the commercial success to the difference between the claim invention and the prior art. And that's the strap that keeps it on your foot so people can wear them when they go to the swimming pool. The concept of a strap is old as Methuselah. And if you look at these- Not this strap. Your Honor- This strap gets a patent. Your Honor, you're attributing it to the foam strap. There is no evidence that the commercial success was due to foam. And there's no evidence that the commercial success was due to a strap. Well, even at that, then we've still got expert skepticism. We've got market credence by the rest of the industry. We've got copying. Your Honor, let me deal with that. Expert skepticism. The fact is, this is a substantial evidence review. A lot of the questions you asked, Your Honor, could as well be asked without the strap about what one shoe looks like compared to the other. You could have asked the same questions about the AquaClog as you're asking about the prior art in this case. If you look at page 48- Let's move to infringement. I don't know whether Methuselah was an ordinary observer or not, but I think we are. And the differences between what's in the patent and what's in the accused are rather minor. One would think an ordinary observer wouldn't even notice them. They all have holes on the top of the shoe, some of them circular, and they have the side vents, some of them the same trapezoidal design. What was in the infringement? The answer is in Egyptian goddess. Egyptian goddess makes absolutely clear, and I can read the sentence, when the claim design is close to the prior art designs, small differences between the accused design and the claim design are likely to be important to the eye of the hypothetical ordinary observer. But they're not close to the prior art. The prior art didn't even have a strap. Your Honor, the prior art did have a strap. And because Whitman Saddle makes clear that the prior art is not a single reference alone, it's a combination of references. And if you look at page 48 of our brief, you'll see that these magnificent designs from Lord of the Rings, Ring of Sauron, Ring of Fire, and who knows what else, are actually all present if you combine a gear and aqua clog. And there was a reason to combine a gear with aqua clog, because the reason is that they both kept the shoes on the foot. And the court's case law makes absolutely clear that when you have one purpose in common, the fact that there are other purposes that may not be met don't matter. This whole concept of passive restraint is a figment of the attorney's imagination. It's not in the patent. It's not in the claims. It's not in the claim construction. So the combination is what you look at. You look at a gear plus the shoe. And I'd like to make one last point about foam, because Judge Rader asked a number of questions. This is a substantial evidence case. And there is substantial evidence that, in fact, a person of ordinary skill in the art would logically use foam in combination with foam. It's the point that Judge Prost mentioned and the commission found. It is logical to use foam and foam. Secondly, the president of Finn Project that originally developed the aqua clog, in fact, experimented with foam straps. He made a foam strap. And if you look at the record, if you look at our brief, you will see on page 10 of our brief, they claim certain information was confidential. You'll see why the foam wasn't used. And you'll see, when you look at page 10, you'll see that the KSR case applies, the Frisket versus Real Network applies, that that evidence is evidence that can be used. And it's substantial evidence. It makes no difference what evidence they have. Thank you. We've let you both run over. And we'll give Mr. Otteson five minutes of rebuttal. Thank you very much. Thank you, Your Honor. Thank you. A couple of quick points, unless the court has some questions. First of all, with respect to the 789 patent, the design patent, the only evidence at all in the record about how an ordinary observer would assess substantial similarity comes from Crocks and its expert. There is nothing from intervener's expert on this at all, except for one thing. Mr. Nutt, respondent's expert at trial, was asked, isn't it true that there is no prior art clogged with a backstrap that is closer to the 789 design than the Holy Souls Explorer? He said, OK, now I accept the statement. This is significant. This is a guy who was legitimately an expert in the prior art of footwear, having collected magazines, trade journals on shoes for 40 years. I then asked him, the samples in the magazines that you found are not as close to the 789 patent as the Holy Souls Explorer, right? He agreed with me. Same thing on the Compel II, one of the Payless shoes. Are you aware of any prior art clogged with a backstrap that's closer to the 789 design than the Compel II? He agreed, no, he wasn't aware of it. The Compel II is another good example. Here was the Holy Souls Explorer that he testified about. I think we can see why he agreed there was nothing in the prior art as close to the patent as that. And here's another good example, which is the Payless shoe, which happens to have, if you look closely, diamonds. But you can see that it shares these dominant design features with the patent, as your honor. Is that the test under Egyptian goddess, whether or not the accused design is closer to the prior art than to the patent? I think under Egyptian goddess, that's probative, your honor. But I think the test is still substantial similarity of the overall designs, the designs as a whole. But the fact that the accused designs are closer to the patent design than the prior art is absolutely probative. And that's why I quoted this passage from Egyptian goddess here, because that's exactly what the court said. If the accused design is copying a particular feature of the claim design that departs conspicuously from the prior art, which we do have here, then the accused design is naturally more likely to be infringing. Could I ask another question, Mr. Otteson? Yes, your honor, please. When I was talking with Mr. Dunner, he gave me the idea that the aqua clog as prior art was somehow in dispute. Was that ever disputed? Well, they tried to. They never disputed that the patent examiner had the aqua clog before him and considered it completely in the examination? The respondents at trial disputed that. We believe that it was a specious argument. And the reason for that is what Mr. Dunner failed to point out to you with the little sheet that he held up was that was a printout from a website. And the URL was available on that. But his point is that that's what was available to the examiner, and therefore, he didn't have a very good look at it. Isn't that the point? Right. That's his point. And my point is that on the same page, the examiner had the website address. So he could easily go and take a look at the shoes on the website. Could. Could. Do you know that he or she did? I don't know, but it was definitely before the examiner. We have this, which is a full picture. Right. And this was a commercial product that was for sale. And that's why Mr. Siemens provided the patent office with a web page where it was for sale, where the examiner could clearly go and look and see what it was. In your grade brief, you seem to take issue with the notion I think raised in Mr. Dunner's brief and in the government's brief that you can combine prior art for purposes of making the analysis. And you seem to say under Whitman Saddle, no, it doesn't really allow you to combine the prior art. In this case, presumably, a gear and the apple clock. Well, actually, what he was talking about in the context of Whitman Saddle had to do with the infringement argument for the 789. Combine prior art for purposes of your analysis? Not that you can't under any circumstance, but Whitman Saddle is completely different. In Whitman Saddle. Gary was relevant to the utility patent, where you surely can combine prior art. Gary was what the commission used to say to find the. No, what I'm talking about in the 789, the argument is that there is a sort of, you look at the prior art, and you look at Gary, and the apple clock. And I mean, presumably, you're going to put the two together, the strap and the clock. Right, right. Do you take issue with the notion that one is allowed to do that under the case law? Yes, because in this particular case, this is absolutely improper hindsight reconstruction. In a situation where the ALJ and the commission found that the 789 patent was valid over the same combination. In fact, the ALJ said, you don't even get close by adding the Gary strap. But the point really is that the addition of this particular strap in this particular location, on this particular clock, completely changed the ornamental and aesthetic aspects of this design. And what they're doing at page 10 of their brief, or wherever it was, where they Frankensteined that one in, that is improper hindsight reconstruction. In Whitman Saddle, which was a design patent case, it was common for a Saddle customer to come in and say, I want the back half of that one and the front half of that one. Mr. Utterson, as you note, your red light is on. Your time has expired. Thank you, Your Honor. There's an old expression, if the shoe fits, put it on. We'll see which side, which argument fits. Thank you, Your Honor.